[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Youth Services (hereafter DCYS), in February 1991 filed a petition to terminate parental rights in committed child Diamond. The petition is granted.
Diamond was born May 30, 1988, so he is now three years old. An Order of Temporary Custody was signed in connection with a Neglect Petition filed at Waterbury January 5, 1990 alleging the child was being 1) denied proper care and attention emotionally and 2) permitted to live under conditions, circumstances or associations injurious to his well being. Conn. Gen. Stat. Sec. 46b-120. The petition allegations were that the child had been found in the mother's apartment without a reliable guardian; her whereabouts were unknown. In fact, the police by forceful entry raided her apartment where two men were arrested for narcotics violations. Diamond was sitting on the side of the bed. There was no food in the unit. The men were also charged with risk of injury. Section 53-21.
The court docket sheet indicates the mother did not appear for the hearing on the Order, but she did admit to the petition on February 13, 1990, when the child was committed to DCYS to August 13, 1991. Evaluations and drug testing were ordered with a six month in-court review. See Sec. 17a-15. CT Page 9613
A petition for extension of commitment was granted by agreement on July 26, 1991.
The current petition represents that for more than one year the father has abandoned the child, Sec. 17a-112
(b)(1), the mother has failed to achieve such degree of personal rehabilitation after a prior adjudication of neglect as would encourage the belief that within a reasonable time, considering the age and needs of the child she could assume a responsible position in the life of the child, Sec. 17a-112
(b)(2), and for both there is no ongoing parent-child relationship and to allow further time for the establishment or reestablishment of that relationship would be detrimental to the best interest of the child, Sec. 17a-112 (b)(4). (Formerly Sec. 17a-43a).
Public policy is to protect children and to strengthen the family and to make the home safe for children. Sec. 17a-101 (a). Although interference is sometimes required, natural rights of parents undeniably warrant deference and, absent a powerful countervailing interest, protection. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 640, 436 A.2d 290
(1980). Therefore, statutory criteria must be first met before termination can be accomplished. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 671-673, 420 A.2d 875 (1979).
The procedure and standard of proof involved in a termination petition are aptly described in In re Shannon S.,41 Conn. Sup. 145, 146, 150, 562 A.2d 79 (1989).
The mother, born November 27, 1960, and child are represented by court appointed attorneys.
 I
The DCYS mandated Social Study in February 1990 indicated that the mother had moved to Waterbury some ten months prior. Initially she stayed at a Salvation Army shelter. After finding an apartment, she subsequently rented a room to a drug dealer at $200.00 per day and began to use drugs. She was on city welfare. She intended to undergo drug rehabilitation on her own efforts.
Diamond was nineteen months old when placed in foster care. A January 1990 evaluation by St. Mary's Hospital Foster Care Clinic indicated the child was delayed in many areas and had been referred to an audiologist and the Department of Mental Retardation Stimulation Program. Although a urologist recommended remedial surgery, the mother objected. The mother did want visitation. CT Page 9614
As a result of the circumstances which produced DCYS intervention, the mother was arrested for Risk of Injury to this child. Section 53-21.
On January 30, 1990, the mother and Waterbury DCYS executed a six month Service Agreement under which the mother undertook to complete a drug rehabilitation program and to secure a home and job. DCYS agreed to assist her where possible and offered to return the child to mother on the successful realization of the Agreement. Exhibit 9. The mother made no attempt to pursue rehabilitation.
A DCYS status report dated July 18, 1990 for an August 14 in-court review indicated the child had been shifted to a different foster home where he has since remained. The mother expressed a desire to DCYS workers for reunification and understood the need for compliance. The mother did not attend the August court review, reportedly because she was in a drug treatment program. The venue was shifted from Waterbury to Middletown at the request of DCYS in order "to better serve family". See court memorandum. On July 16, 1990, a three month Service Agreement was executed by mother and DCYS where the mother agreed to enter an in-patient drug rehabilitation program, recommendations. DCYS agreed to provide supportive services. The mother was cautioned in the Agreement that DCYS would consider termination of parental rights if she failed to comply. Exhibit 5. This Agreement was based on the mother's representation in June that she was awaiting admittance to the Connecticut Valley Hospital ninety day drug rehabilitation program. The mother entered the program on June 5, 1990. However, because of inappropriate behavior, she was discharged on July 12, 1990, perhaps not coincidently; following a nolle on July 9, 1990 of the Risk of Injury charge. At her request, DCYS referred her to Connections, a drug and alcohol rehabilitation program. She resumed substance abuse, even though DCYS reminded her of the need to honor her Agreement. She complied only with visitation.
Although she did complete a DCYS referred twenty-one day drug rehabilitation program at Rushford Center Intensive Treatment in August 1990, her participation was minimal and she rejected aftercare Narcotics or Alcohol Anonymous programs and, counseling. While at Shepard Home she did attend two counseling sessions in October 1990, and claims to have attended Middlesex Community College.
DCYS tried again. After negotiation which reduced her responsibilities, on November 14, 1990 mother and DCYS signed another Service Agreement emphasizing the need to follow through with discharge recommendations. She was also to attend CT Page 9615 a parents support group and study child development. DCYS agreed to provide supportive services and again warned of possible termination. Exhibit 6. The mother failed to follow through on any of her expectations, except visitation.
Instead, the mother was back using drugs; November 20, while at Shepard Home she requested DCYS assistance. DCYS provided a list of programs, a phone and transportation. Although she had an appointment with St. Mary's Hospital, she elected to first drive to Tennessee with her mother to see her other son. The mother did complete a twenty-eight day inpatient program at Reid Treatment Program in Avon by the end of January 1991, but again failed to follow through with any aftercare.
By February 1991, the mother was back on cocaine and declined to enter another program. DCYS then filed this petition to terminate.
In contradiction to the earlier neglect Social Study, the current termination Study recites the mother failed to complete high school because of heavy alcohol and marijuana use; she was freebasing cocaine about 1988. In the neglect Social Study the mother asserts she was drug clean when she got the apartment but started drugs shortly thereafter. Both Studys were based apparently on mother's imput. Exhibit 7. The mother testified that she completed high school, one year at business school and a course in 1990 at Middlesex Community College, held four jobs between 1984 and 1988, and her drug use started after the death of her brother in 1986. The mother also told the evaluator she finished high school and some secretarial courses. Exhibit 2.
In a psychiatric evaluation in March 1990, the mother advised the doctor she would automatically have another baby if she lost Diamond. In late 1990 she reiterated her plan to DCYS.
The mother states she needs long term treatment: she concedes that although she is pregnant and hoped to stay clean during pregnancy she is still an addict currently using drugs. As of September 6, 1991, she was admitted to a program at Women and Children's Center which services pregnant women who are substance abusers. She apparently made no efforts in 1991 after Reid and before the Center to undergo drug rehabilitation. By agreement after close of evidence, a letter dated September 16, 1991 was submitted to court confirming the mother's admission to this voluntary substance abuse treatment facility with a stay of six to twelve months. Although the mother and Center suggest a six to twelve month program, the brochure states that the length of stay is approximately one year. Exhibit 8. She CT Page 9616 admits she cannot now take full responsibility as she needs to be drug free, employed and in an appropriate dwelling. Even though the Center can include existing children, she admits she could not take Diamond until she successfully completes her proposed program.
Although previously consistent, she discontinued visitation after June 4, 1991, some three months before the last hearing. The mother has been critical of the foster mother, i.e. she holds him too much, he touches her face. At these visits the mother lacks sensitivity to her son. She tried to teach her two year old son to box so he could "defend himself from rapists . . . I don't want him to be a faggot." Exhibit 7, page 11. Despite all the visitation, the son displays little emotion during visits and there is no sign of attachment to the mother, even though the mother usually caressed and kissed him. There is no mutual responsiveness in a caring manner. No parent/child bond.
The child now attends an early intervention and stimulation program two days a week. As a three year old, he functions at eighteen to thirty month level. He has remained in the same foster home since June 4, 1990. He is happy, more verbal and thriving with noticeable developmental progress. The foster parents are interested in adoption. Their interest does not substitute for statutory adjudication.
 II
Dr. Michael A. Nelken, an Assistant Clinical Professor of Psychiatry at the University of Connecticut School of Medicine, did the initial family evaluation on March 7, 1990 when Diamond was 21 months. Various people were also interviewed.
At the initial evaluation the mother advanced a disturbing theory: holding spoils children; an infant should be tough as a boxer. She would "beat" the child. A harsh prescription of mother-child interaction containing physical and emotional abuse. Her insight was limited and she assumed minimum responsibility for her life pattern. The mother suffered from a Dependent Personality Disorder. Underlying her problems was her perception of disfavor in her own family. At the time of the interview, although a user, she was in remission from cocaine dependence. However, she had used crack about February 7, 1990, about a week before the commitment plea date. At the time of her arrest she had lost so much weight from crack she mistakenly thought she had AIDS.
Diamond had a Developmental Expressive Language Disorder CT Page 9617 of isolation and deprivation of verbal stimulation, confirming the mother's child-rearing regimen. At nineteen months the child had no significant vocabulary. The child's cringing, clinging, and defensive sleeping suggested Avoidant Disorder of Childhood.
The doctor was pessimistic in 1990 about the mother's ability to provide a safe, secure and encouraging environment in the foreseeable future. He recommended that Diamond be placed in a Legal Risk adoptive home because there was little evidence the mother could provide an appropriate environment in the foreseeable future. If the child were to be placed with his aunt, the sibling relationship indicated the mother should live elsewhere. The mother should attend daily Narcotics Anonymous and but even long term non drug counseling would not be effective fast enough to allow her to properly raise Diamond. State's Exhibit 2.
The evaluation was updated on May 16, 1991 when Diamond was thirty-six months old. Dr. Nelken saw mother and child and reviewed the termination petition and Social Study. Mother made no attempt to gain contact with her son at the evaluation. She listlessly touched him once or twice during the interview. She ignored her son who in turn showed no interest in her. She asked the child to write his name. Exhibits 3 and 4. She had no plan to regain custody. The concern about the adult sibling relationship had been realized; the mother is no longer on good terms with her sister. The mother had not completed drug rehabilitation programs; she was living day-to-day without any reality in long-term goals.
Diamond's intellectual functioning in May 1991 was well below age appropriate levels. While his mood was anxious, he had no psychotic symptoms.
The expert's earlier pessimistic evaluation of the mother or child has not changed in the fourteen months. Her inability to parent may have been caused by her own family relationships, personality or her addiction. Because her parenting skills are so deficient she is an unfit parent, particularly for a child like Diamond with specialized needs. She has no insight into her situation and no plan to care for Diamond. Diamond may be diagnosed as mildly mentally retarded. His condition results from isolation, possible genetics and lack of maternal bonding and verbal stimulation. The mother's approach to parenting, including her practice of isolating the child in a separate room to avoid drug activity, had the negative effect of depriving the infant of stimulation, comfort and encouragement required for normal development. CT Page 9618
Dr. Nelken concluded that Diamond's life should be stabilized now without delay and that the mother is unable to participate affirmatively in that process. Even with intensive parental training, the doctor doubted she could develop any skill. Diamond needs remedial speech therapy, special education and counselling. The mother does not agree with Dr. Nelken. She claims a close, protective relationship with Diamond. Psychological testimony from professionals is accorded great weight in these proceedings. State's Exhibit 1. In re Nicolina T.,9 Conn. App. 598, 520 A.2d 639 (1987). In re Theresa S.,196 Conn. 18, 28, 491 A.2d 355 (1985).
 III a.
The first part of Sec 17a-112 (b)(2) relates to degree of personal rehabilitation achieved by the mother since the prior commitment. Failure to meet expectation per se does not satisfy the statute. "Personal rehabilitation" refers to restoration of this mother to a constructive and useful role as a parent even with the use of support programs. In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986). The mother's status has not improved; the mother still cannot function as an acceptable parent and still cannot resume a responsible role for Diamond. Secondly, the court must still determine whether she should be given more time to pursue rehabilitation. Considering Diamond's age and needs, her level or lack of rehabilitation does not encourage the belief in the court that within a reasonable time, the mother could assume a responsible position in the life of Diamond. In re Luis C., 210 Conn. 157, 164-169,554 A.2d 722 (1939). The mother's family and personal history, even apart from drug addiction, are formidable obstacles for her. She has failed in the past to utilize services provided by DCYS. Her past does not auger well for the future. Diamond may have spent almost half his life in foster care by the time mother hopefully completes her proposed long term program.
By clear and convincing evidence, the state has proven this statutory ground has existed for more than one year. Sec. 17a-112 (b)(2).
 b.
The state also seeks termination against the mother based on Sec. 17a-112 (b)(4). First, the proper construction of this section was recently addressed by the Connecticut Supreme Court in In re Jessica M., 217 Conn. 459, ___ A.2d ___ (1991), when it analyzed the similar Probate Court clause. Sec. 45a-717
(f)(3), formerly Sec. 45-61f(3). Jessica's mother like CT Page 9619 Diamond's mother had lost custody of a child. As non-custodial parents they cannot be expected to meet the needs of a child on a day to day basis. The high court consequently constructed "this statutory ground for termination to require a finding that no positive emotional aspects of the relationship survive." In re Jessica M., supra, 470. The court finds that this parental relationship is not an affectionate one or one of mutual interest, even though the mother does handle the child. There is no indication of positive memories and feelings by the child for his mother. No positive emotional aspects of a parent-child relationship survive as to this parent. See also In re Juvenile Appeal, (84-6), 2 Conn. App. 705, 483 A.2d 1101
(1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985) and In re Juvenile Appeal (Anonymous), 181 Conn. 638 436 A.2d 290
(1980) where mother had maintained contact by visitation. Secondly, to allow further time for the establishment or reestablishment of a mother-child relationship would be detrimental to the best interest of this child of young age and special needs.
By clear and convincing evidence, the state has proven this statutory ground against mother has existed for more than one year. Conn. Gen Stat. Sec. 17a-112 (b)(4).
 c.
This pregnant mother on drugs has a trail of failed efforts at rehabilitation despite knowing the risk of failure. Yet it is not her addiction or mental condition that per se causes her present dilemma. Rather it is her inability to function properly as a mother under the statutory tests. Children, especially young children, can be perishable. The court cannot defer a decision in this matter on the hope that somehow the mother will in an acceptable time complete drug rehabilitation to sustain a drug free life and complete counselling to maintain a healthy and safe mother/child relationship. An unreasonable delay would be detrimental to Diamond's best interest.
 IV a.
The father no longer resides in this area. Although he is aware of Diamond, he has had no contact with or about his son. He has provided no support. His name does not appear on the birth certificate.
Diamond refers to his foster father as Daddy.
By clear and convincing evidence, for more than one year Diamond has been abandoned by his father in the sense that CT Page 9620 the father has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
Section 17a-112 (b)(1).
 b.
The state also seeks termination against the father based on Sec. 17a-112 (b)(4). Abandonment and no ongoing relationship sections are not identical although the facts might, as here, support necessary findings under both sections. Having abandoned his child at birth, there was never any positive emotional father-son relationship. There is nothing to survive, and no positive emotional aspects of a parent-child relationship does survive as to this parent. To allow further time for the establishment or reestablishment of a parent-child relationship would be detrimental to the best interest of this child. In re Jessica M., supra.
By clear and convincing evidence, the state has proven this statutory ground against father has existed for more than one year. Section 17a-112 (b)(4).
 V
Having established the statutory grounds, the state has also convinced the court by clear and convincing evidence that it is in Diamond's best interest to terminate parental rights.
As part of the disposition the court must consider in writing six factors under Section 17a-112 (d). In re Barbara J.,215 Conn. 31, 47, 574 A.2d 201 (1990). Supplementing the findings already made in this memorandum, the court makes additional findings
DCYS has provided at least three drug rehabilitation programs plus shelters for the mother. Even with her failures, DCYS moved to set up another facility. The mother's rejection of aftercare eliminated hope for success. She minimized her level of addiction and ignored services which confirmed her addiction. Certainly the mother had maintained personal co contact through visitation which did not take place in the foster home. The mother has no regular contact with the foster parents. There were no unreasonable acts or conduct by anyone other than the mother which prevented her from maintaining a meaningful relationship with the child. Her economic circumstances did not interfere with her custody. Her personality and addiction prevented her from functioning as a proper parent.
The failure of the father to assume any responsibility CT Page 9621 for his son prevented any services to him. The child has no feelings or ties to him, never having seen him. The father has made no effort to permit the child to be returned to him. No one has blocked the father. His economic circumstances are immaterial. The court is unaware of any efforts to pursue child support from him.
 VI
Accordingly, the court grants the termination petition.
The Commissioner of DCYS is appointed statutory parent. DCYS shall report to the court within ninety days on a case plan and at least every twelve months thereafter shall report an implementation of the plan. The court shall review the plan at least once a year until any proposed adoption plan has been finalized. Section 17a-112 (b)(i).
SAMUEL S. GOLDSTEIN JUDGE, SUPERIOR COURT